1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                         **EASTERN DISTRICT OF CALIFORNIA**

9

10

11   MARK CURTIS ORTEGA,                    Case No. 1:12-cv-00070-AWI-SKO-HC

12           Petitioner,                    FINDINGS AND RECOMMENDATIONS TO
                                            DENY THE PETITION FOR WRIT OF
13       v.                                 HABEAS CORPUS (DOC. 1)

14                                          FINDINGS AND RECOMMENDATIONS TO
                                            ENTER JUDGMENT FOR RESPONDENT AND
15   MARTIN BITER, Warden,                  TO DECLINE TO ISSUE A CERTIFICATE
                                            OF APPEALABILITY
16           Respondent.
                                            **OBJECTIONS DEADLINE:**
17                                          **THIRTY (30) DAYS**

18

19        Petitioner is a state prisoner proceeding pro se and in forma

20   pauperis with a petition for writ of habeas corpus pursuant to 28

21   U.S.C. § 2254.  The matter has been referred to the Magistrate Judge

22   pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 through 304.

23   Pending before the Court is the petition, which was filed on

24   December 23, 2011.  Respondent filed an answer to the petition on

25   July 30, 2012.  Petitioner filed a traverse on September 24, 2012.

26       I.   Jurisdiction

27       Because the petition was filed after April 24, 1996, the

28   effective date of the Antiterrorism and Effective Death Penalty Act

     of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v.

                                        1

1   Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002,

2   1004 (9th Cir. 1999).

3       The challenged judgment was rendered by the Superior Court of

4   the State of California, County of Fresno (FCSC), located within the

5   territorial jurisdiction of this Court.   28 U.S.C.

6   §§ 84(b), 2254(a), 2241(a), (d).   Further, Petitioner claims that in

7   the course of the proceedings resulting in his conviction, he

8   suffered violations of his constitutional rights.

9       The Court concludes it has subject matter jurisdiction over the

10  action pursuant to 28 U.S.C. §§ 2254(a) and 2241(c)(3), which

11  authorize a district court to entertain a petition for a writ of

12  habeas corpus by a person in custody pursuant to the judgment of a

13  state court only on the ground that the custody is in violation of

14  the Constitution, laws, or treaties of the United States.   Williams

15  v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562

16  U.S. - , -, 131 S.Ct. 13, 16 (2010) (per curiam).

17      An answer was filed on behalf of Respondent Warden Martin

18  Biter, who had custody of Petitioner at the Kern Valley State

19  Prison, his institution of confinement when the petition and answer

20  were filed.   (Doc. 23.)   Petitioner thus named as a respondent a

21  person who had custody of Petitioner within the meaning of 28 U.S.C.

22  § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in

23  the District Courts (Habeas Rules).   See, Stanley v. California

24  Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).   The Court

25  concludes that it has jurisdiction over the person of the

26  Respondent.

27  ///

28  ///

2

II.   Background

A.   Procedural Summary

In its unpublished decision filed on April 15, 2011, the Court of Appeal of the State of California, Fifth Appellate District (CCA) summarized the charges and the jury's findings as follows:

> On November 20, 2008, the Fresno County District Attorney charged defendant with murder (Pen.Code, § 187, subd. (a); count 1), two counts of home invasion robbery (§§ 211, 213, subd. (a)(1)(A); counts 2 & 3), arson (§ 451, subd. (d); count 4), receiving stolen property (§ 496, subd. (a); count 5), and participation in a criminal street gang (§ 186.22, subd. (a); count 6). As to count 1, the information further alleged that defendant committed the murder during the commission of a robbery (§ 190.2, subd. (a)(17)(A)), that a principal intentionally discharged a firearm causing a death (§ 12022.53, subds.(d), (e)(1)), and that defendant committed the murder in association with a street gang with the specific intent to promote the gang (§ 186.22, subd. (b)(1)). As to counts 2 and 3, the information alleged that a principal intentionally discharged a firearm causing a death during commission of the robbery (§ 12022.53, subds.(d), (e)(1)), and that defendant committed the robberies in association with a street gang with the specific intent to promote the gang (§ 186.22, subd. (b)(1)). The information also alleged that defendant suffered a prior conviction within the meaning of the Three Strikes law (§§ 667, subds.(b)-(i), 1170.12, subds. (a)-(d)), and that he suffered a prior serious felony conviction (§ 667, subd. (a)(1)).
>
> ...
>
> Defendant's codefendants, Hernandez and Oscar Verdugo, were charged with the same counts, except for count 5 (receiving stolen property).
>
> The jury found defendant guilty as charged on counts 1 through 5, and found true the special allegations. The jury found Hernandez guilty on counts 2 and 3, and not guilty on counts 1 and 4. The jury acquitted Verdugo on all counts.
>
> On the bifurcated gang charge (count 6), gang allegations, and prior conviction allegations, the trial court found

3

defendant guilty on count 6, and found true the gang and
prior convictions allegations.   (Footnotes omitted.)

People v. Mark Curtis Ortega, case number F057431, 2011 WL 1449538,

at *1-*2 (April 15, 2011).

        B.   Factual Summary

    In a habeas proceeding brought by a person in custody pursuant

to a judgment of a state court, a determination of a factual issue

made by a state court shall be presumed to be correct; the

petitioner has the burden of producing clear and convincing evidence

to rebut the presumption of correctness.   28 U.S.C. § 2254(e)(1);

Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).   This

presumption applies to a statement of facts drawn from a state

appellate court's decision.   Moses v. Payne, 555 F.3d 742, 746 n.1

(9th Cir. 2009).   The following statement of facts is taken from

the CCA's opinion of April 15, 2011.

    FACTS

On March 28, 2008, at about 9:00 or 10:00 p.m., defendant
(nicknamed "Little Demon") and Hernandez (nicknamed
"Mellow") picked up 21-year-old Benita (nicknamed "Cute")
at her boyfriend's apartment.FN4 Benita had known
defendant for about a month and had socialized with him
about a dozen times. She had known Hernandez for about as
long, but she had only seen him a few times. Defendant was
driving a stolen Mazda Tribute sport utility vehicle (the
SUV), the vehicle Benita had always seen him drive.FN5 He
was wearing a red shirt, and both he and Hernandez were
wearing red bandanas around their necks. They drove to the
store for cigarettes, then went to a house where they
joined several other people, including Verdugo (nicknamed
"Little Silent"), whom Benita had never met. Everyone at
the party had been smoking methamphetamine and was "high"
or "tweaking." At some point, defendant pulled his red
bandana over his face and took pictures of himself and
Hernandez with a cell phone. When the methamphetamine

4

started to run low, defendant said they should go get more, and Hernandez agreed.

FN4. Benita was on probation for possessing stolen property. She also had a prior misdemeanor conviction for lying to a police officer, and a prior juvenile conviction for running away with her own child. In this case, she pled to home invasion robbery and was sentenced to 10 years in prison in exchange for her testimony.

FN5. The SUV was stolen on January 19, 2008.

During the party, Benita was sending text messages to 27-year-old Regina. Regina was like a mother to Benita and she called her "[M]om." Benita had lived with Regina in the past and wanted to move back in. Regina had told Benita she could move in, and Benita wanted to pay her a good faith deposit to show she could actually pay the rent.FN6 Benita had been staying with her boyfriend for about one month and she was looking for a permanent residence because she and her boyfriend had been arguing.FN7

FN6. On cross-examination, Benita testified that she called Regina on about March 27. Regina asked Benita if she had spoken to her younger sister, Heather. Benita said she had not. Regina was upset and told her that Heather had stolen drugs from her.

FN7. On cross-examination, Benita testified that she was not in school and did not have a job. She was "just out there messing up. Hanging around with the wrong crowd."

Defendant asked Benita if he could borrow her cell phone. Benita let him use the phone and when he returned it to her, she could see he had accessed her contacts list. He asked her, "Who is that girl Regina in your phone?" Benita said she was a friend. Defendant asked Benita if she wanted a ride to Regina's home. Benita said she wanted a ride to her own home, but defendant insisted on taking her to Regina's home.FN8 Defendant got up and went outside. Benita and Hernandez followed. Defendant and Hernandez walked away from Benita and conversed for about five

5

minutes while she talked to her boyfriend on her cell phone. When defendant returned to her, he asked her again if she wanted to get dropped off at Regina's. Again, she told him no, she wanted to go home. Defendant asked her if Regina still sold drugs and Benita replied that she did. FN9 Defendant said, "All right[,] I'm going to take you to Regina's."

> FN8. On cross-examination, a detective testified that text messages from Regina to Benita showed that Regina was expecting Benita to come to her apartment that night.

> FN9. On cross-examination, Benita testified that Regina had been selling small amounts of drugs for about one year to make extra money on the side. Benita had used methamphetamine for a few years. She smoked methamphetamine three or four times per week, but she did not get drugs from Regina. Benita usually smoked methamphetamine when she was with defendant.

At about 1:45 a.m., defendant got in the SUV. Benita got in the passenger seat and Hernandez and Verdugo got in the back seat.FN10 Defendant's rifle was between the seats by his right leg; Benita had always seen him with it. He frequently played with it and she had seen him shooting chickens with it in the mountains. As they drove to Regina's apartment, which was on First Street, diagonally across from Radio Park, defendant passed the rifle to the back seat. Defendant parked the SUV about half a block from Regina's apartment, on a side street perpendicular to the alley that ran behind the apartments. Everyone got out of the SUV and defendant told Benita to go inside. Benita thought they were just going to drop her off, but they said they were going to another house nearby. Defendant told Benita to contact them when she was ready to leave Regina's.

> FN10. Benita testified that Verdugo asked defendant to take him home.

Benita walked down the alley and knocked on Regina's back door because Regina was usually in the back bedroom on the back side of the apartment. No one answered, so Benita went to the front door and rang the doorbell. Again no one answered, so she left and returned to the SUV. The three

men were still standing next to the SUV talking. Defendant asked Benita why she had returned. When she said no one answered the door, defendant told her to go back to Regina's apartment. As she walked back, she called Regina and asked her to let her in. It was not unusual for Benita to show up at Regina's apartment late at night. When Benita knocked on the front door, Gabriel, Regina's ex-boyfriend, answered the door.

Benita knew Gabriel because he and Regina had been together a long time, but Benita did not expect to see him there. She was surprised because she had not seen him for about a year. Benita did not like the way he had treated Regina in the past.FN11 When Gabriel answered the door, he had his socks off, as though he had been there a while. Benita assumed he was going to stay the night with Regina.

> FN11. On cross-examination, Benita testified she did not like Gabriel because he had beaten Regina in the past. Benita thought he was violent. She knew he had hit Regina in the face and Regina had gotten a restraining order against him. As far as Benita knew, Regina did not want him around. Benita was afraid Regina was making a mistake by letting him back into her home. Benita had seen him act violently in the past. He sometimes had a tendency to become violent when he was under the influence of methamphetamine.

Benita went into Regina's bedroom and gave Regina a hug. Benita gave Regina $50 as a deposit for moving back into her apartment. They sat and talked with Gabriel.FN12 Benita and Regina smoked some methamphetamine, but did not share it with Gabriel because Regina did not want him to smoke. Regina told Benita not to pass the methamphetamine to him. Gabriel was going in and out of the room. It did not appear to Benita that there was any tension between Gabriel and Regina, that they were arguing, that he was injured, or that they were surprised to see Benita. Regina did not complain to Benita that she and Gabriel were fighting.

> FN12. On cross-examination, Benita testified that on the night of the murder, Regina again told her that Heather had stolen an eight ball

7

from her. Benita thought an eight ball was worth
about $280.

Regina's current boyfriend, Matthew, kept calling Regina,
but she did not want to talk to him and she kept telling
him to stop calling. After a short time, Benita went into
the kitchen to eat something. Defendant called Benita and
said they would be right back. Benita finished eating her
burrito and returned to the bedroom to talk with Regina.
Benita sent a text message to defendant to hurry and come
pick her up. He responded that they wanted to buy some
drugs from Regina, and Benita should let them in when they
got there. Benita did not mention defendant or Hernandez
to Regina.

Benita did not see Gabriel consume any drugs at Regina's
apartment that night, but he was "tweaking real bad." He
was restless, moving around a lot, and could not sit
still. Benita could tell he was high when he opened the
apartment door, but she did not see him exhibit any type
of violence, such as yelling, screaming, or pushing. Nor
did she see him argue with Regina or raise his voice.

Benita's boyfriend called her and they started to argue.
She went into the living room and continued arguing with
him. He wanted her to come home. She said she was trying
to go home, but defendant was "acting stupid" and would
not give her a ride home. Her boyfriend could not pick her
up because he did not have a car. Defendant repeatedly
sent her text messages, asking her which apartment was
Regina's. According to cell phone records, defendant and
Benita exchanged 42 text messages in the hour between 2:20
a.m. and 3:20 a.m. Benita sent defendant Regina's address.

At some point, a woman came into Regina's apartment and
talked to Regina for a few minutes. Benita thought the
woman was buying methamphetamine. Benita did not know her,
but she had seen her in jail a few times.FN13

> FN13. On cross-examination, Benita testified
> that a lot of people came into Regina's
> apartment at night to buy drugs. Benita wanted
> to help Regina stop selling drugs out of her
> home because a lot of riffraff came over and
> Benita thought it was dangerous for Regina.

8

While Benita was still in the living room, and Regina and Gabriel were in the front bedroom, Benita heard the back door open. She saw defendant and Hernandez walk in the back door, which was unlocked. Benita went to the door and asked defendant what he was doing because they just walked in. Defendant and Hernandez were wearing sweaters and they stood right next to each other with their hands behind their backs. Benita did not see a gun. Defendant put his hand on Benita's face and told her to shut up, and he guided her toward the door. Again, she asked him what he was doing and he told her to shut up. He said to her in a harsh whisper, "Shut up, Benita. I'm trying to rob this bitch." But Benita protested. Defendant told her "not to trip." He promised not to harm Regina. He said that "his word [was] with Bond," and he "put that on the block he wasn't going to hurt Regina." This meant that he was promising on his street and on the Bond Street Bulldog gang members with whom he claimed to associate. He repeatedly told Benita to go to the car, but she refused. She begged them not to do anything. Defendant was getting mad and he told her to "get the fuck in the car." Hernandez pushed her out the door and promised not to let defendant harm Regina. Benita was afraid. She left the apartment and walked to the alley. She was surprised to see that the SUV was now parked in the alley behind Regina's garage. The SUV was running and Verdugo was in the driver's seat. Benita got into the passenger's seat. She was angry. Verdugo asked if she was all right, and he asked if she knew Regina. She told him she knew Regina, but she did not speak to him further because she was angry. Verdugo told her "not to trip" and "it was going to be all right."

According to Gabriel, when Benita was in the living room looking at her cell phone, he and Regina heard a knock on the back screen door and Regina looked at him with a worried expression.FN14 Then defendant and Hernandez barged into the room. Defendant was wearing a red beanie on his head and a red bandana covering his face. He was holding a rifle. Hernandez was wearing a dark jacket with a hood over his head. Defendant immediately shot Regina and she fell to the floor. Hernandez hit Gabriel on the side of his head with a fist. Then Hernandez yelled at Regina, "Where are your keys, bitch?" Hernandez yelled at Gabriel, "Give me your shit." Gabriel gave Hernandez his house keys and said, "I don't have anything else."

9

Hernandez left Regina's purse on the bed and ran out of the room.FN15

> FN14. Gabriel's testimony contradicted Benita's in various regards. He testified that he arrived after Benita, and found Regina and Benita in the bedroom talking.

> FN15. Gabriel never saw Hernandez's face and he saw defendant's eyes only. Gabriel could not identify either of them.

Defendant kicked Regina and asked her, "Where is the money, bitch?" While he was kicking her, he kept the rifle pointed at Gabriel, who was sitting on the bed. Gabriel was afraid and he regretted not being able to protect Regina. Defendant told Gabriel to lie face-down on the bed, but Gabriel refused to comply for fear that defendant would shoot him in the back of his head. Gabriel held his hands up and said, "I don't have anything to do with this. I don't know what's going on." Defendant said, "I heard she's got a gun, too. Do you know where the gun's at?" Gabriel said, "I never knew about her having no gun." When defendant again asked where the money was, Gabriel offered to look through Regina's purse for him. Defendant signaled for him to do it, so Gabriel grabbed the purse and dumped it on the bed. He found a gold bracelet, but no money.

Defendant said, "I'm going to kill this bitch." He told Gabriel he was going to kill him too because he thought Gabriel was going to try something. Defendant said he was getting an "itchy trigger finger" and he was "ready to die by the Fresno PD." Afraid for his life, Gabriel told defendant, "My cousin is Donkey," referring to a cousin who was well-known in prison. Gabriel hoped defendant would realize there would be retribution if he hurt him. Gabriel repeated that he would not do anything and that he did not know what was going on. Defendant told him to go sit in the hallway with his legs crossed and his hands on his head. He said, "I ain't going to kill you[;] it's this bitch." Gabriel asked defendant why he was going to kill Regina, and he answered, "She burned my homeboy. Sold him 50 dollars worth of cut." This meant the methamphetamine appeared to be real, but was not.

Gabriel heard defendant shoot the rifle a few more times, then defendant said, "I'm gone," and he ran past Gabriel.

10

Gabriel thought the rifle sounded like a .22-caliber
rifle. Gabriel waited about 10 seconds, then got up and
went to Regina. He told her, "It's okay. Get up. They're
gone." He picked her up and sat her on the bed, but she
fell back on her back, unresponsive. He said, "They're
gone. They're gone." She gasped for air and her eyes
rolled back in her head. When Gabriel saw blood on his
hand, he lifted Regina's shirt and saw a bullet wound near
her pelvis. Only then did he realize she had been shot. He
ran around the apartment looking for a telephone, then ran
outside and told a neighbor to call 911. While Gabriel was
speaking to the 911 operator, he went back into the
apartment to check on Regina, and reported that she was
still not responsive. Gabriel waited outside the apartment
for the police.

Gabriel admitted at trial that he had originally lied
about these events to the police because he was violating
a restraining order by being near Regina. He was afraid he
would get arrested for violating the restraining order,
and he also knew he would be a suspect in the shooting. He
initially said he was walking down the street when he
heard a gunshot from the apartment.

Gabriel also admitted having three prior misdemeanor
convictions: spousal battery in 2005, receiving stolen
property in 2006, and giving false information to a police
officer in 2008. Gabriel testified that these convictions
did not cause him to testify untruthfully. He testified
that he did not bring a gun to Regina's apartment and he
did not kill her. He was currently in compliance with his
probation, although he had violated it, and he was almost
finished with his batterer's treatment program.FN16

> FN16. On cross-examination, Gabriel said he
> would often go to Regina's to do things for her.
> He would help her out around the house and she
> would pay him cash. He had been to her apartment
> five or six times in the past year. They
> maintained a sexual relationship, although she
> made it clear to him that they were not
> "together" and that he was not "her man."
> Gabriel described her as the love of his life.
> He had deep feelings for her, but it did not
> upset him that she had a boyfriend. He also had
> a girlfriend. He and Regina had an understanding
> that their relationship was just sex. The night

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> she was killed, Regina wanted Gabriel to come
> over, but she told him that he could not come if
> her boyfriend was there, and Gabriel agreed.
> Gabriel knew Regina was selling methamphetamine.
> He was addicted to it at the time.

Gabriel admitted that he had battered and falsely
imprisoned Regina in 2005. He held her down and put his
hands over her face, causing her injuries. She called the
police and Gabriel pled guilty to those charges. Gabriel
admitted that he thereafter continued to violate the
restraining order granted by a court in May 2006. Gabriel
denied that the injury he sustained the night Regina was
killed resulted from a scuffle he had with Regina in which
she lost three fingernails. Gabriel denied shooting and
killing Regina.

Benita testified that she did not see Gabriel with a gun
that night and she did not see Gabriel kill Regina. The
only person she saw with a gun was defendant.

Meanwhile, about five minutes after Benita got in the SUV
in the alley, defendant returned to the SUV carrying his
rifle and Regina's purse. Benita asked him what he was
doing and he told her to shut up. He put the purse in the
back seat and the gun on the floor. Verdugo asked
defendant what the hell he was doing. Defendant told him,
"Don't trip," and said they were going to leave right
away. Defendant walked away from the car and Benita
assumed he returned to the apartment. Benita heard
Regina's car alarm go off, then saw her garage door open
and Hernandez back Regina's red Geo Prizm out of the
garage. Defendant returned to the SUV and got in the back
seat. Verdugo was mad at defendant and he cussed and
yelled at him until they reached their destination.
Defendant just laughed at Verdugo, which made him even
madder. He angrily shook his head.

Regina's cell phone rang inside her purse. Upset, Benita
told defendant he was "fucked up." He told her to "stop
tripping." He put his hand on her shoulder and asked her
if she heard any gunshots. She said she did not. He said,
"All right," and told her to shut up. He said he was going
to drop her off at home and she could call Regina in the
morning. They drove back to the house where the party was
held. Hernandez met them there in Regina's car.

12

Chica, a young woman at the party, came out and asked about Regina. Chica recognized Regina's car and asked Benita, "Is that Regina's car over there? [¶] ... [¶] Is Regina in there? Tell her to get down and say hi." Hernandez told Benita not to say anything. Defendant told someone, "Take that bitch inside and tell her to shut up."

Chica saw defendant come back into the house. Then she saw some girls looking through a purse. Chica assumed it was Regina's purse because she knew Regina and recognized the types of things she carried. Chica knew Regina would not go anywhere without her purse and Chica started to realize they had stolen her purse or done something else to her. Chica asked someone to remove the purse from her sight. Chica felt Benita was not a good friend to Regina because Benita was around Regina for the methamphetamine and because Benita's sister, Heather, had stolen from Regina. Chica thought Benita and defendant had been together at the party, perhaps as boyfriend and girlfriend.

Benita stayed in the car, and after a few minutes, she, defendant, and Verdugo left. When defendant dropped Benita off at the apartment, she went directly inside and started to cry. She was mad and afraid. Her boyfriend asked her what was wrong, but she did not tell him what had happened. She wanted to call Regina to see if she was okay, but she did not know her home number. Benita stayed up all night.FN17

> FN17. On cross-examination, Benita testified that as she walked back to her apartment, she deleted most of the text messages from defendant because she did not want her boyfriend to see them. She denied that she deleted them because she was afraid the messages would reveal that she tried to get defendant to come to Regina's to help clean up the mess Benita created when she killed Regina. Benita denied killing Regina.

Officers responded to Regina's apartment at 3:42 a.m., two minutes after being dispatched. Gabriel answered the door almost instantly. He was on the telephone, apparently speaking to the police dispatcher.FN18 The officers found Regina lying on the bed with her legs hanging down. She was gasping for air and her eyes were open, but her pupils were totally dilated and she was not blinking. Her eyes were becoming dry. The officers observed a small bullet

13

wound in her right pelvis from a .22-caliber gunshot, and a small graze wound on her right arm. Regina was taken to the hospital.

> FN18. On cross-examination, an officer testified that the door to the apartment was closed when he and another officer arrived. Gabriel answered and led the officers to the kitchen as he spoke on the telephone, and the officers were frustrated by his preoccupation with his telephone conversation. Eventually, Gabriel told them Regina was in the bedroom.

Four expended .22-caliber cartridges were found in Regina's living room, hallway, and bedroom. A criminologist later determined that two of the four expended .22-caliber cartridges found in Regina's apartment had been fired by defendant's rifle. Two of the expended cartridges could not be conclusively identified as having been fired by the rifle.

At 4:42 a.m., Benita received a text message from defendant asking her how she was going to act. He said, "Man my girl. How gonna you act."

At 7:33 a.m., Benita received another message from him telling her he was leaving town. He said, "Cute, I'm gone b. Yo boy wiggin out." "I'm smashing out of town." "C U when I see U."

At about 8:00 a.m., Regina died at the hospital.

After learning of Regina's death, the detective assigned to the case went to the hospital to view her body. He noticed she had several broken fingernails. When Regina's entire apartment was searched, no fingernails and no telephone or cell phone were found.

Also at about 8:00 a.m., defendant gave Chica a ride to work. Defendant drove with a rifle across his lap. Hernandez, who was also in the car, had a long, samurai-type sword.

At 8:00 or 9:00 a.m., detectives interviewed Gabriel at the police station. Gabriel had just learned that Regina had died, and he was sobbing and crying. He had a red mark on the side of his head and down his neck. When a

14

detective noticed some red marks (but no broken skin) on Gabriel's arm, Gabriel explained that he had scratched himself.FN19 Gabriel demonstrated how easily he could scratch himself. The marks he made faded during the interview. Soon after the detectives spoke to Gabriel, their investigation began to focus on Benita and the three defendants.FN20

> FN19. On cross-examination, the detective testified that he said to Gabriel, "Looks like a chick scratched you."

> FN20. On cross-examination, the detective testified that Gabriel first said he went into Regina's apartment because he thought two men had left the apartment and he thought it was unusual or suspicious. The detective told Gabriel he knew he had been in the apartment. Gabriel was nervous and said he knew he was a suspect. Finally, he admitted being inside Regina's apartment and witnessing her shooting. The detective requested that Gabriel be tested for gunshot residue, which was collected but never tested. Gabriel told the detective that Benita's sister, Heather, had been living with Regina, and Regina had accused Heather of stealing methamphetamine from her about two days before.

At about 10:00 a.m., defendant and Hernandez came to Benita's apartment. They came into her bedroom and defendant told her, in her boyfriend's presence, that they wanted to take her to the mountains. She refused because she was mad at defendant and she did not want to go anywhere with him. She had gone to the mountains with him once or twice in the past. After her boyfriend left the room, Benita asked defendant what had happened, but he shook his head and did not answer. He kept saying, "Get your stuff[;] we're going to the mountains. We can't be here." Then he said, "I think I murked [Regina]," which meant he thought he had killed her. Benita started crying and told defendant to get out. He put his head down and repeated that he was sorry. Hernandez just shook his head. Benita told them to leave. She went outside with them and defendant continued to ask her to go with him, but she refused. Benita's boyfriend told her to come back inside and she did.FN21

> FN21. On cross-examination, Benita testified
> that she went to Easton with defendant and her
> boyfriend on March 30. She knew the police were
> looking for her. She went with defendant because
> her boyfriend was with her.

At 7:31 p.m., Benita received a text message from
defendant. He said, "[M]y dog, answer da phone. Hella
important. Number 007." He had sent her many other
messages and he kept calling her, but she did not want to
talk to him and she refused to answer.

At about 11:30 p.m., a woman walking in her neighborhood
saw an SUV parked behind a small red Geo. Defendant and
two other men in dark clothing were standing by the red
Geo. They poured gas over the red Geo, set it on fire, and
drove away. The woman had previously seen defendant and a
neighbor pushing the red Geo into the neighbor's back
yard. A few days after the car fire, the neighbor
threatened the woman, telling her to keep her mouth shut
or what had happened to her friend would happen to her.

In the early morning hours of March 30, after learning
that Regina's car had just been burned, the detective
began actively pursuing defendant. Later in the day, he
also started looking for Hernandez.

On April 1, at about 8:00 p.m., undercover officers
observed defendant walking with a limp and an obvious
bulge in his clothing. They watched him place a .22-
caliber rifle, containing a loaded magazine of nine live
cartridges, behind a gas station and quickly walk into an
adjacent fast food restaurant, where the officers
apprehended him. Hernandez and Verdugo were not with him.

Defendant was carrying keys to the SUV, which was parked
nearby. The SUV's license plates were covered with Auto
Maxx paper plates. Defendant was also carrying a cell
phone, a red bandana, and some papers, one of which was
signed by "Little Demonologist." When the detective, who
was present at the scene, picked up defendant's cell phone
and looked at it, he immediately saw a "wallpaper"
(background) photograph displayed on the phone's face. It
was a photograph of a male wearing a red hat down to his
eyebrows, a red bandana over his face (revealing only his
eyes), and red clothing.FN22 When the detective examined

the contacts in defendant's cell phone, he found someone
referred to as "Mellow Bonded 007," with a number the
detective knew was Hernandez's number, even though it was
registered to someone else.

> FN22. The detective testified the male in the
> photograph was wearing red clothing, but it
> appears to us he was wearing a shirt that was
> predominantly light blue.

The SUV contained five live .22-caliber cartridges and six
expended .22-caliber cartridge casings. The criminologist
later determined that four of the six expended .22-caliber
casings had been fired from defendant's rifle. The others
were inconclusive. The SUV's glove compartment contained
several CD's, four of which had Regina's name written on
them.FN23 Behind the seat was Regina's daughter's toy.

> FN23. Regina's sister testified that Regina
> always signed her name on her things.

When the police searched Hernandez's bedroom, they found a
samurai-type sword in a case and a CD case between two
mattresses on the floor. They also found CD's and a CD
case, all with Regina's name on them.

On April 5, at about 4:00 p.m., while walking down the
street with a friend, Benita was arrested and taken to the
police department. She was arrested on outstanding
warrants for probation violations, but the police wanted
to question her about the murder.FN24 Benita had been
running from the police, especially since she found out
Regina had been killed. As Benita walked to the interview
room in the police station, she saw Hernandez in a holding
cell, and she became afraid for her safety. She decided to
lie to the officers.

> FN24. On cross-examination, Benita testified
> that she had failed to drug test since November
> 2007 and she was trying to avoid contact with
> law enforcement.

The detective walking with Benita to the interview room
noticed her startled look when she saw Hernandez. Her eyes
widened and she looked like a deer caught in headlights.
She took a step to the side and the detective told her to
keep walking. During the subsequent interview, Benita was

17

soft spoken and not overly emotional. She seemed curious and inquisitive. At first, Benita's story did not correspond with what the detective knew about the crime. When he confronted her with the disparities, she told him she was afraid to tell the truth. Her demeanor changed and she started to sob. The detective reassured her. She said she wanted to "wipe the slate clean."

The detective testified that, about 30 hours before Regina was shot (i.e., at about 9:40 p.m. on March 27) defendant left someone a voicemail message (the parties stipulated it was not left for either Hernandez or Verdugo). The detective recognized defendant's voice. In the message, defendant said, "Aye Bulldog man. [¶] ... [¶] I been cup caking with some little hoe ass beezee ... nigga ..., you know what I mean? [¶] ... [¶] Hit me up boy, Little D." At this point, a female voice could be heard in the background. Then defendant said, "Lay down this ... hit me up boy. [¶] ... [¶] I need the strap at least, man." The detective testified that the term "strap" meant a firearm or gun.

Also on March 27, defendant left a message for "Mellow" on a cell phone registered to someone named Dominguez Perez. The cell phone contained seven voicemail messages that mentioned the name "Mellow."

The pathologist who conducted the autopsy of Regina's body found four gunshot wounds: a grazing wound on her upper right arm, a wound through her right thigh, a wound near her vagina, and a wound to her right hip. The bullet that caused the wound to her hip injured her iliac artery and vein, and caused her to bleed to death. On Regina's hands, some of her acrylic nails were missing. Regina had no injuries consistent with choking.

Benita testified that she was afraid of defendant because he was a murderer and because he had threatened her in jail. He told her if she went to court and said anything about what happened that night that "he was going to make sure he fuck[ed her] too." To Benita, this meant someone would kill her. She heard him say this through the sink pipes in jail, which was called the "jail Internet ." She recognized his voice, but she asked, "Who is this?" and he identified himself by his nickname. He told her that she owed it to him to try to save him because he had saved her when Hernandez wanted to take her to the mountains and

18

kill her. Benita was afraid defendant could get someone to kill her in jail. She found out he was getting copies of the police report and was mailing them to someone. At first, she was afraid to report defendant's threats to the police. She was afraid of Hernandez because of the way he had laughed when defendant said he had kicked Regina after shooting her.FN25 Later, the officers promised Benita that defendant and Hernandez would not be able to hurt her.

> FN25. On cross-examination, Benita admitted writing one letter to Hernandez and one letter to Verdugo after the crime, but she denied writing to defendant. She examined certain letters and denied writing them. She denied ever calling herself "Bonita."

On cross-examination, Benita testified that Gabriel and her sister, Heather, dated after Regina was killed.

Defense

Benita's boyfriend testified that he had received many letters from Benita while he was in jail for five months. The boyfriend was familiar with Benita's handwriting and he identified one of the letters she wrote him. He testified that Benita's nickname was "Cute," and she commonly referred to herself as "Bonita." In the letter, she referred to him as "Moko," which was his nickname. He testified that he had met defendant only once.

On cross-examination, the boyfriend testified he had always known Benita to spell her name "Bonita"; he had never seen her spell her name "Benita." The boyfriend had met defendant, but he did not remember a time when defendant came to his apartment and met with him and Benita toward the end of March. Similarly, the boyfriend did not remember defendant wanting to take Benita to the mountains. He also did not remember Benita being upset during that conversation. The boyfriend did not remember defendant ever coming to his apartment. He did not remember defendant giving him and Benita a ride to Easton. He had never been to Easton. The boyfriend did remember that Benita lived with him in his apartment, but he explained he was always high on methamphetamine and he did not keep track of the months. Benita quit living with him when she got in trouble with the law and could not stay around.

The boyfriend did remember that, not long before Benita got into trouble, defendant had dropped her off at the apartment and walked her up to the apartment door.

The boyfriend testified that he did not want to testify because the matter was none of his business and he did not want anything to do with it. He had no concerns about testifying; he just did not want to be there.

On recross-examination, the boyfriend did not remember telling the defense investigator that Benita had come home scared late one night, and he denied telling him that the next day defendant came by the apartment to talk to Benita. The boyfriend did not remember telling the investigator that defendant wanted to talk to Benita alone but the boyfriend would not allow it. The boyfriend denied knowing who "Little Demon" was; he had never heard that nickname before.

Larry Stewart, a forensic scientist and handwriting expert, testified that he had reviewed certain handwritten letters. He opined that they were all written by the same person.

Rebuttal

The defense investigator testified that the boyfriend did in fact tell him that Benita came home late one night and was scared when she got home. The boyfriend also told the investigator that the next day defendant came by the apartment and wanted to talk to Benita alone, but the boyfriend would not allow it.

People v. Ortega, 2011 WL 1449538, at *2-*10.

III.   Admission of Petitioner's Juvenile Adjudication

Petitioner argues that it rendered his trial unfair and a violation of his constitutional rights to permit introduction of his prior juvenile robbery adjudication involving an unrelated theft of a play station without the use of force, as a consequence of questioning Gabriel Alvarado about his past relationship and conduct

20

with the victim.   Petitioner also argues it was inadmissible as

character evidence under state law  (Pet., doc. 1 at 4, 19-21;

trav., doc. 27, 13-14.)

        A.   <u>Standard of Decision and Scope of Review</u>

Title 28 U.S.C. § 2254 provides in pertinent part:

> (d) An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claim that was adjudicated
> on the merits in State court proceedings unless
> the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding.

Clearly established federal law refers to the holdings, as

opposed to the dicta, of the decisions of the Supreme Court as of

the time of the relevant state court decision.  <u>Cullen v.</u>

<u>Pinholster</u>, - U.S. -, 131 S.Ct. 1388, 1399 (2011); <u>Lockyer v.</u>

<u>Andrade</u>, 538 U.S. 63, 71 (2003); <u>Williams v. Taylor</u>, 529 U.S. 362,

412 (2000).

A state court's decision contravenes clearly established

Supreme Court precedent if it reaches a legal conclusion opposite

to, or substantially different from, the Supreme Court's or

concludes differently on a materially indistinguishable set of

facts.  <u>Williams v. Taylor</u>, 529 U.S. at 405-06.  The state court

need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002).  A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but applies it to a new set of facts in an objectively unreasonable manner, or 2) extends or fails to extend a clearly established legal principle to a new context in an objectively unreasonable manner. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.  An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable.  Williams, 529 U.S. at 410.  A state court's determination that a claim lacks merit precludes federal habeas relief as long as it is possible that fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011).  Even a strong case for relief does not render the state court's conclusions unreasonable.  Id.  To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 786-87.

    The standards set by § 2254(d) are "highly deferential

22

standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof.  Cullen v. Pinholster, 131 S.Ct. at 1398.  Habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA.  Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).  The deferential standard of § 2254(d) applies only to claims the state court resolved on the merits; de novo review applies to claims that have not been adjudicated on the merits.  Cone v. Bell, 556 U.S. 449, 472 (2009).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen v. Pinholster, 131 S.Ct. at 1398.  Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1).  Id. at 1400.

Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  A state court decision on the merits based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence

presented in the state proceedings.  Miller-El v. Cockrell, 537 U.S.

322, 340 (2003).  For relief to be granted, a federal habeas court

must find that the trial court's factual determination was such that

a reasonable fact finder could not have made the finding; that

reasonable minds might disagree with the determination or have a

basis to question the finding is not sufficient.  Rice v. Collins,

546 U.S. 333, 340-42 (2006).

To conclude that a state court finding is unsupported by

substantial evidence, a federal habeas court must be convinced that

an appellate panel, applying the normal standards of appellate

review, could not reasonably conclude that the finding is supported

by the record.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th ir.

2004).  To determine that a state court's fact finding process is

defective in some material way or non-existent, a federal habeas

court must be satisfied that any appellate court to whom the defect

is pointed out would be unreasonable in holding that the state

court's fact finding process was adequate.  Id.

With respect to each claim raised by a petitioner, the last

reasoned decision must be identified to analyze the state court

decision pursuant to 28 U.S.C. § 2254(d)(1).  Barker v. Fleming, 423

F.3d 1085, 1092 n.3 (9th Cir. 2005); Bailey v. Rae, 339 F.3d 1107,

1112-13 (9th Cir. 2003).  Here, the last reasoned decision on

Petitioner's claims was the decision of the CCA, which issued after

remand from the California Supreme Court (CSC) and was filed on

April 15, 2011. (LD 9.)

B.   The State Court's Decision

The decision of the CCA on this issue is as follows:

I. **Evidence of Defendant's Prior Robbery Adjudication**

At trial, the parties stipulated that on April 26, 2002, defendant and two cohorts drove to the house of a minor. Defendant and one cohort entered the house. While the cohort tried to distract the minor, defendant took a video gaming system. They left the house and drove away in the waiting car. Defendant was charged as a juvenile, and admitted to committing a robbery in violation of section 211.

Defendant contends the trial court erred by allowing the prosecution to introduce evidence of his prior robbery adjudication after he introduced evidence of Gabriel's prior misdemeanor convictions for spousal abuse and receiving stolen property. Defendant argues the court committed various evidentiary errors surrounding the admission of the prior robbery adjudication, but we conclude any error in the admission of the evidence was harmless.

First, the evidence that defendant robbed and killed Regina was absolutely overwhelming. Defendant entered Regina's apartment; defendant told Benita he wanted to rob Regina; defendant shot Regina, demanded her property, and looked through her purse; defendant told Gabriel he wanted to kill Regina because of a bad drug deal; defendant shot Regina three more times when he was alone with her; defendant left Regina's apartment with his rifle and Regina's purse; defendant contacted Benita through the night, then admitted to her in the morning that he thought he had killed Regina; defendant and the neighbor pushed Regina's car into the neighbor's back yard; defendant and two other men set Regina's car on fire; the neighbor threatened the woman who witnessed the burning of the car; defendant disposed of a rifle; both the crime scene and defendant's SUV contained expended cartridges that had been fired by the rifle; defendant's SUV contained Regina's CD's and Regina's daughter's toy; and defendant threatened Benita when they were both in jail. In light of this powerful evidence, we are hard-pressed to imagine an

25

evidentiary error that could have prejudiced defendant.
Certainly this was not one of them. Accordingly, the
overwhelming evidence of defendant's guilt convinces us
any error in the admission of his prior robbery
adjudication was harmless under any standard. (*People v.
Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California*
(1967) 386 U.S. 18, 24.)

Second, we also note that defendant's own defense
portrayed him as a thief who was not particularly bright.
Defense counsel FN26 relied upon defendant's status as a
thief to explain why, after the murder, he possessed the
murder weapon and Regina's property (and why he regularly
drove a stolen vehicle). Defense counsel told the jurors
in his opening statement that they would hear evidence
suggesting that defendant and his cohorts went to Regina's
apartment after the murder and did what thieves do—they
stole her property and took the murder weapon that someone
(the real murderer) had left behind. Defense counsel
stated:

> FN26. Our reference to "defense counsel" is to
> defendant's (not Hernandez's or Verdugo's) trial
> counsel.

> "[Defendant] is not a[n] upstanding citizen. I'm
> not here to try to suggest to you that
> [defendant] is anything more than a petty thief,
> but that's what he is. He's a thief. He steals
> cars. That's what he does. That's what he was
> doing that night when he was called over to that
> house many times by [Benita] to help her clean
> up her mess. [¶] You're going to hear evidence
> to that suggestion that [defendant] and these
> gentlemen came over after the murder not aware
> of what happened in that house. They saw an
> opportunity to do what they do which is to be
> thieves, take some of her property, see a gun
> that's left there. They take those items and
> they leave. [¶] ... [¶] Frankly, it wasn't a
> difficult proposition to get these three
> gentlemen over to that apartment that evening,
> once they saw an opportunity to take property.
> [T]hey have property of the victim, not because
> they committed murder but because they saw an
> opportunity to take property.... If you pulled

the trigger, you would have known. You would
have never taken the property."

Defense counsel concluded:

"What happened after the crime, it is what it
is. [Defendant] made tremendous mistakes that
assisted [Benita] in her attempts to put the
blame off on somebody else. I did refer to these
guys at some level as sort of the Keystone Cops.
They come bumbling into a scene. They take
property. They're thieves, and they leave, then
they realize the next day what they just got
themselves into."

In closing argument, defense counsel reiterated:

"I told you in opening statement [defendant],
he's a thief. I'm not going to sit here and tell
you [defendant] is an angel. I'm not going to
tell you [defendant] is the best citizen that's
ever walked our planet. I'm not here to pull the
wool over everybody['s] eyes. He's not a
murderer."

As this argument reveals, defendant's defense theory
depended on his history as a thief. In light of the
defense's portrayal of defendant as a thief, admission of
evidence of his prior robbery adjudication for taking a
video gaming system was not prejudicial.

Third, the court's evidentiary decisions did not prevent
defendant and Hernandez from presenting a third party
culpability defense. In defense counsel's opening
statement, he set out the theory, suggesting that although
Gabriel and Benita claimed to be innocent bystanders, they
were in fact responsible for the murder. Defense counsel
explained that Gabriel had been convicted of domestic
violence; that he and Regina had a difficult relationship;
and that he and Regina obviously engaged in a struggle
before her death, evidenced by his scratches and her
missing fingernails.

Similarly, Hernandez's defense counsel stated:

"Now, Gabriel [ ] had had a previous
relationship with the victim, Regina Morales. A

27

> previous incendiary, violent, contentious, disputatious, relationship with her. A relationship that was so violent that three years before he was charged with a felony spousal abuse, a felony assault which was reduced to a misdemeanor. [¶] Now, it may come out in this trial there is something called spousal abuse or abuse of a partner, something like that. It was a violent assault on her three years before in which he grabbed her and tried to smother her face, that sort of thing. There was a restraining order preventing Gabriel [ ], because of the violence he committed on her previously."

Hernandez's counsel noted that Gabriel had a prior conviction for domestic violence and for receiving stolen property, then stated:

> "Now, there is going to be testimony that will be elicited through various witnesses that not only Gabriel [ ] having an opportunity and a potential motive for killing Regina Morales, but also Benita [ ], the individual who is given the ten year deal, not the lifetime sentence, but the ten year—ten year deal by the prosecution, that she had a motive herself for retaliating against the victim, Regina Morales. [¶] ... [¶] Well, I think the evidence is going to show that Benita [ ] was using a heavy amount of drugs, was homeless, wanted someplace to go, had no money and that Regina Morales wasn't going to let her come back. [¶] Also, ... Heather [ ] had been staying with the victim but Benita['s] younger sister Heather was kicked out of the victim's house because Heather stole money and stole drugs from Regina Morales. So, there is a motive of retaliation against Regina Morales for not letting Benita [ ] move back in and for having ejected the younger sister from the apartment."

Then, during the presentation of evidence, the defense introduced evidence of Gabriel's past violence toward Regina; Benita's dislike for Gabriel because of his violent treatment of Regina; Gabriel's ongoing sexual relationship with Regina despite her refusal to resume a

serious relationship with him; her current relationship with another man; and Gabriel's past conviction for violence against her. This evidence supported the theory that Gabriel was a jealous lover who was dissatisfied with his relationship with Regina and motivated to harm her. The evidence also suggested a rift between Benita's sister, Heather, and Regina that might have created a motive for retaliation in Benita.

Furthermore, Gabriel's and Regina's credibility was thoroughly impeached. They were exposed as liars and unsavory characters. They both had criminal histories and they both used drugs and associated with drug users and drug dealers. Benita socialized with criminals who carried weapons and stole cars. She participated in the crimes against Regina, a woman she professed to love as a mother. Benita and Gabriel both initially lied to the police, and Benita testified against her comrades after making a deal with the prosecution.

During closing argument, defense counsel argued:

> "We were relying upon an admitted perjurer [Benita] for her version of the facts as to what happened that night and not to mention the inconsistencies I think were fairly obvious between what she claimed happened and what Gabriel [ ] said happened. [¶] Ladies and gentlemen, again, we've made suggestions in my opening statements and perhaps Gabriel [ ] had motives and opportunities to commit the homicide. Perhaps it was Benita [ ] had the opportunity and motive. [¶] Let's not forget Gabriel had a relationship with Regina and a restraining order and past incidents of significant violence...."

Later, defense counsel argued:

> "Again, ladies and gentlemen, Benita [ ] took the opportunity to protect whomever the real murderers were, whether it was herself or whether Gabriel [ ] was involved, I don't know but she's not being honest. [¶] ... [¶] And getting to Gabriel [ ], I say things are inconsistent, not words but actions. Why is Gabriel [ ] alive? That doesn't make any sense,

1
2
3
4
> ladies and gentlemen. If people are going to go in and brutally kill somebody, leave a witness there alive, then leave Benita [ ] alive? If you kill one person, why not kill them all? Well, maybe there are reasons that Gabriel and Benita were still alive. Perhaps they were in on whomever was ripping her off."

5
6
7
8
> Defendant's portrayal of himself as a thief and his ability to present a third party culpability defense further confirm that he was not prejudiced by admission of his prior robbery adjudication.

9
People v. Ortega, 2011 WL 1449538, at *10-*13.

10
### C.   State Law Evidentiary Claims

11        To the extent Petitioner argues that admission of the

12   adjudication was contrary to state evidentiary law, Petitioner's

13   claim is not cognizable in this proceeding.  A federal court

14   reviewing a habeas petition pursuant to 28 U.S.C. § 2254 has no

15   authority to review alleged violations of a state's evidentiary

16
17   rules.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

18   Because federal habeas relief is available to state prisoners only

19   to correct violations of the United States Constitution, federal

20   laws, or treaties of the United States, federal habeas relief is not

21
22   available to retry a state issue that does not rise to the level of

23   a federal constitutional violation.  28 U.S.C. § 2254(a); Wilson v.

24   Corcoran, 131 S.Ct. at 16; Estelle v. McGuire, 502 U.S. 62, 67-68

25   (1991).  In a habeas corpus proceeding, this Court is bound by the

26   California Supreme Court's interpretation and application of

27   California law unless it is determined that the interpretation is

28

untenable or a veiled attempt to avoid review of federal questions. Murtishaw v. Woodford, 255 F.3d 926, 964 (9th Cir. 2001).

Here, there is no indication that the state court rulings were associated with an attempt to avoid federal question review. Accordingly, this Court is bound by the California courts' application of state evidentiary law.  Any claim of misapplication or misinterpretation of that law is not cognizable in this proceeding and is subject to dismissal.

       D.  Due Process Violation

The introduction of evidence alleged to be prejudicial violates the Due Process Clause if the evidence was so arbitrary or prejudicial that its admission rendered the trial fundamentally unfair and violated fundamental conceptions of justice.  Perry v. New Hampshire, 132 S.Ct. 716, 723 (2012); Estelle v. McGuire, 502 U.S. at 67-69; Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

To be entitled to relief in habeas corpus proceedings, a petitioner generally must show that a trial error resulted in actual prejudice.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Constitutional trial errors occurring during the presentation of evidence to the jury are generally subject to harmless error analysis, which is tested on habeas corpus review by determining whether any error had a substantial and injurious effect or influence in determining the jury's verdict.  Id. (applying the

31

standard to habeas review of <u>Doyle</u> violations concerning

introduction of a defendant's silence after <u>Miranda</u> warnings).

However, a claim that the Due Process Clause was violated by the

admission of evidence alleged to have been prejudicial involves

determining whether the evidence was so arbitrary or prejudicial

that its admission rendered the trial fundamentally unfair and

violated fundamental conceptions of justice.  <u>Perry v. New</u>

<u>Hampshire</u>, 132 S.Ct. at 723; <u>Estelle v. McGuire</u>, 502 U.S. at 67-69;

<u>Holley v. Yarborough</u>, 568 F.3d at 1101.

Here, although the state court did not expressly determine

whether the admission of the evidence constituted constitutional

error, the state court nevertheless concluded that the prosecution

had shown beyond a reasonable doubt that any constitutional error

was harmless.  The court referred to multiple standards and cited

<u>Chapman v. California</u>, which sets forth a standard for evaluating

the harmlessness of constitutional errors.  See <u>Chapman v.</u>

<u>California</u>, 386 U.S. 18, 24 (1967.

Arguably there is no clearly established federal law requiring

the exclusion of the evidence in question.  Under the AEDPA, even

the clearly erroneous admission of evidence may not permit the grant

of habeas relief unless forbidden by clearly established federal law

as established by the Supreme Court.  <u>Holley v. Yarborough</u>, 568 F.3d

at 1101.  The Supreme Court has not yet made a clear ruling that

admission of irrelevant or overtly prejudicial evidence constitutes

a due process violation sufficient to warrant issuance of the writ.

See, Estelle, 502 U.S. at 75 n.5; Holley, 568 F.3d at 1101.  Absent such clearly established federal law, it cannot be concluded that a state court's ruling was contrary to or an unreasonable application of Supreme Court precedent under the AEDPA.  Holley, 568 F.3d at 1101 (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)); see also Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006) (denying a due process claim concerning the use of propensity evidence for want of a "clearly established" rule from the Supreme Court); Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008).  An unreasonable application of clearly established federal law under § 2254(d)(1) cannot be premised on an unreasonable failure to extend a governing legal principle to a new context where it should control.  White v. Woodall, - U.S. -, 134 S.Ct. 1697, 1706 (2014).  Therefore, "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).  Application of a rule is required only if it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.  White v. Woodall, 134 S.Ct. at 1706.

Even if this Court considers more generally whether, in light of all the circumstances, admission of the evidence rendered the proceedings fundamentally unfair, there was no prejudicial denial of due process.  Admission of evidence violates due process only if there are no permissible inferences that a jury may draw from it, and the evidence is of such quality as necessarily prevents a fair trial.  Boyde v. Brown, 404 F.3d 1159, 1172-73 (9th Cir. 2005)

(quoting <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (1991)).  Here, Petitioner's prior robbery conviction was actually consistent with Petitioner's theory of defense, namely, essentially admitting that the evidence tended to show post-homicide commission of theft and destruction of evidence, but nevertheless denying any participation in the murder.  The prior theft offense was much less violent than the charged offense of murder.  Further, in light of Petitioner's drug use, gang-related conduct, and what in effect amounts to a defense admission that he engaged in theft and destruction of evidence after the murder, admission of a juvenile adjudication of robbery could not be said to have violated fundamental conceptions of justice or to have rendered the proceedings unfair.

In light of the entire record, including multiple sources of evidence of Petitioner's guilt, any error did not have a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, it will be recommended that Petitioner's due process claim concerning admission of the juvenile adjudication be denied.

IV.   <u>Limitation of Cross-Examination</u>

Petitioner alleges he suffered violations of his rights to confront and cross-examine witnesses, a fair trial, and to present a defense guaranteed by the Sixth and Fourteenth Amendments when the defense was prohibited from examining prosecution witnesses with respect to several matters.

///

///

///

A.   <u>Legal Standards</u>

1.   <u>Right to Confrontation and Cross-Examination</u>

The Confrontation Clause of the Sixth Amendment, made binding on the states by the Fourteenth Amendment, provides that in all criminal cases, the accused shall enjoy the right to be confronted with the witnesses against him.  <u>Pointer v. Texas</u>, 380 U.S. 400 (1965).  The main purpose of confrontation as guaranteed by the Sixth Amendment is to secure the opportunity for cross-examination to permit the opponent of the party presenting a witness to test the believability of the witness and the truth of his or her testimony by examining the witness's story, testing the witness's perceptions and memory, and impeaching the witness.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678 (1986); <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974).

Even if there is a violation of the right to confrontation, habeas relief will not be granted unless the error had a substantial and injurious effect or influence in determining the jury's verdict. <u>Jackson v. Brown</u>, 513 F.3d 1057, 1084 (9th Cir. 2008) (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)).

2.   <u>Fundamental Fairness and Right to Present a Defense</u>

Although state and federal authorities have broad latitude to establish rules excluding evidence from criminal trials, the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation clauses of the Sixth Amendment guarantee a criminal defendant a meaningful opportunity to present a complete

defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  It is a

fundamental element of due process of law that a defendant has a

right to present a defense by compelling the attendance and

presenting the testimony of witnesses.  Washington v. Texas, 388

U.S. 14, 18-19, 23 (1967).  However, a defendant does not have an

absolute right to present evidence without reference to its

significance or source; the right to present a complete defense is

implicated when the evidence the defendant seeks to admit is

relevant, material, and vital to the defense.  Id. at 16.  Further,

the exclusion of the evidence must be arbitrary or disproportionate

to the purposes the exclusionary rule is designed to serve.  Holmes

v. South Carolina, 547 U.S. 319, 324-25 (2006).  If the mechanical

application of a rule that is respected, frequently applied, and

otherwise constitutional would defeat the ends of justice, the rule

must yield to those ends.  Chambers v. Mississippi, 410 U.S. 284,

302 (1973).

     However, well established rules of evidence permit trial judges

to exclude evidence if its probative value is outweighed by other

factors such as unfair prejudice, confusion of the issues, or

potential to mislead the jury.  Holmes v. South Carolina, 547 U.S.

at 326.  Thus, it is constitutionally permissible to exclude

evidence that is repetitive, only marginally relevant, or poses an

undue risk of harassment, prejudice, or confusion of the issues.

Holmes v. South Carolina, 547 U.S. at 326-27.

In summary, fundamental fairness does not require the admission of all evidence tendered by the defense.  Arguably there is no clearly established federal law setting controlling legal standards for evaluating discretionary decisions to exclude evidence.  <u>Moses v. Payne</u>, 555 F.3d 742, 758-59 (9th Cir. 2009) (upholding the discretionary exclusion of expert testimony offered by the defense to show a likelihood of victim's suicide and thus the defendant's innocence of homicide); <u>Brown v. Horell</u>, 644 F.3d 969, 983 (9th Cir. 2011), <u>cert.</u> <u>denied</u> <u>Brown v. Horell</u>, 132 S.Ct. 593 (2011) (upholding exclusion of expert evidence).  The Supreme Court's cases have focused only on whether an evidentiary rule, by its own terms, has violated a defendant's right to present evidence; the cases do not 1) squarely address whether a court's exercise of discretion to exclude evidence violates a criminal defendant's constitutional right to present relevant evidence, or 2) clearly establish a controlling legal standard for evaluating discretionary decisions to exclude evidence.  <u>Id.</u>  Therefore, a decision of a state appellate court that a trial court's exercise of discretion to exclude expert testimony did not violate constitutional rights cannot be contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Where exclusion of evidence violates a petitioner's right to present a defense, habeas relief is appropriate only if the constitutional violation resulted in error that was not harmless,

37

that is, error that resulted in actual prejudice, or had a substantial and injurious effect or influence in determining the jury's verdict. Jackson v. Nevada, 688 F.3d 1091, 1104 (9th Cir. 2012) (citing Fry v. Pliler, 551 U.S. 112, 121-22 (2007) and Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  To consider whether the Brecht standard has been met, a court considers various factors, including but not limited to 1) the importance of the witness's testimony in the prosecution's case, 2) whether the testimony was cumulative, 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, 4) the extent of cross-examination otherwise permitted; and 5) the overall strength of the prosecution's case. Merolillo v. Yates, 663 F.3d 444, 455 (9th Cir. 2011) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

> B.   Impeachment of Gabriel Alvarado regarding His Prior Misconduct with the Victim

Petitioner contends he suffered violations of his rights when he was prohibited from impeaching prosecution witness Gabriel Alvarado with questions about the misconduct underlying prior misdemeanor convictions of domestic violence, receiving stolen property, and lying to a law enforcement officer.  Petitioner argues that Alvarado's prior misconduct with the victim was admissible as a crime of moral turpitude; although the misdemeanor conviction of domestic violence might not have been admissible, the underlying

conduct was admissible for impeachment.  Further, because the

evidence had the capacity to raise a reasonable doubt as to guilt,

it was admissible as evidence of third-party culpability.

Petitioner argues that the errors of the trial court were

prejudicial in light of the record, which reflects that Alvarado was

present at the murder, had been convicted of harming the victim in

the past, and bore scratches that could have been inflicted by the

victim, who was missing several acrylic fingernails.  (Pet., doc. 1

at 4, 15-19; trav., doc. 27, 12.)

     The undisputed facts show that significant evidence concerning

Gabriel Alvarado's misconduct with the victim, including the episode

precipitating the prior misdemeanor conviction, was before the jury.

Alvarado admitted breaking down a door to get to the victim, holding

her down, and putting his hands over her face; he conceded that he

repeatedly violated a restraining order as well as the terms of his

probation.  (8 RT 1312-1314, 1349-51.)  Although particular

questions may have been precluded, the jury was given a

significantly detailed history of Alvarado's abuse of the victim and

disobedience of court orders.  In view of the extent of the

testimony already in the record, and considering the strength of the

prosecution's case against Petitioner, any limitation of questioning

in a specific respect did not have a substantial and injurious

effect or influence in determining the jury's verdict.

///

C.   Question regarding Testimony of Officer McCarty

Petitioner alleges that his right to cross-examine the witnesses against him was violated when the trial court prohibited the defense from cross-examining Alvarado about the testimony of William McCarty, the first law enforcement officer on the scene, that when the officer arrived, he found Alvarado inside the apartment with the door closed.  (Pet., doc. 1, 4.)

1)   The State Court's Decision

The pertinent part of the decision of the CCA is as follows:

On cross-examination, Gabriel equivocated about whether he had been inside or outside Regina's apartment when the police arrived. First, he testified that he waited outside Regina's apartment for the police to arrive. Then he said he thought he waited outside, but he could not remember. He did not think he was inside the apartment when the police arrived. He was "pretty sure" he was outside. He eventually agreed with defense counsel that it was his testimony that he was not inside when the first officer arrived. Then defense counsel asked, "And so if [the officer] would have testified that you were inside and opened the door, he would be mistaken?" At this point, the court sustained the prosecutor's speculation objection.

Defendant contends the trial court erred by sustaining the prosecutor's objection because Gabriel was not improperly asked to speculate about the officer's state of mind, but was "merely asked to confirm his own testimony in light of [the officer's] contrary account of events."

Assuming, without deciding, defense counsel's question was proper, we conclude any error in sustaining the objection was harmless. The evidence established that Gabriel was distracted when the officers arrived at Regina's apartment and, at trial, he could not clearly remember whether he had been inside or outside. An officer testified that Gabriel was in a state of preoccupation and panic when the officers arrived—despite defense attempts to portray Gabriel as high on methamphetamine and more worried about

40

his own situation than Regina's survival. Defense counsel asked the officer about Gabriel's behavior when the officers arrived: "It seems to you that [Gabriel] was more interested in telling what his involvement was [on the telephone] than getting you to [Regina], correct?" The officer answered, "He just seemed preoccupied."

Similarly, Hernandez's defense counsel asked the officer on cross-examination, "[D]id that person seem to be agitated?" The officer answered, "He seemed preoccupied, kind of panicked sort of." Counsel then asked, "Did this person who answered the door—did he exhibit to you any of the symptoms of somebody who had been high on meth?" The officer answered, "I couldn't say one way or the other because what happened, we have to evaluate someone [for] more than just a split second. I was only in his presence for maybe five or six seconds total. That was not sufficient for me to be able to formulate any sort of opinion whether he was or not." Counsel persisted: "But the individual nevertheless seemed to be somewhat jumpy; is that right?" The officer responded, "He was preoccupied, ma'am. I couldn't tell you if he was—" at which point counsel changed the subject.

We see no probability whatsoever that defendant was harmed by defense counsel's inability to ask Gabriel whether the officer would be lying if he said Gabriel was inside the apartment when the officers arrived. Considering the evidence regarding Gabriel's uncertain memory and his state of mind at the time of the incident, we see little value to the precluded line of questioning. Moreover, we again stress that the evidence against defendant was overwhelming. Any error was harmless under any standard. (*People v. Watson, supra*, 46 Cal.2d at p. 836; *Chapman v. California, supra*, 386 U.S. at p. 24.)

People v. Ortega, 2011 WL 1449538, at *13-*14.

          2.  <u>Analysis</u>

Review of the trial transcript shows that Gabriel Alvarado was subject to substantial cross-examination concerning his location when law enforcement arrived.  He admitted he initially lied to police regarding his location, his knowledge of the murder, and his

41

relationships with various people involved in the crime because he was frightened of retribution and did not want to precipitate a parole violation.  His failure to recall at trial information that he had reported to law enforcement at the time of the crime was also brought out in cross-examination.  (8 RT 1251, 1268, 1271-85, 1289-1303, 1324-28, 1344-50.)  He also admitted that he had been a methamphetamine addict at the time of the crime.  (Id. at 1298-99, 1316-17, 1322.)

In view of the evidence before the jury and the strength of the prosecution's case against Petitioner, any limitation of counsel's questioning of Alvarado regarding Officer McCarty's testimony did not have a substantial or injurious effect or influence in determining the jury's verdict.  Accordingly, it will be recommended that Petitioner's claim concerning the limitation on counsel's question regarding Alvarado's understanding of McCarty's testimony be denied.

D.   Examination of Gabriel Alvarado regarding Heather

Petitioner contends he suffered a prejudicial violation of his right to confrontation and cross-examination when the trial court sustained objections to defense counsel's questions to Alvarado concerning Benita Ochoa's statement regarding Alvarado's relationship with Benita's sister, Heather.  Petitioner contends that a relationship between Alvarado and Benita's sister indicated a potential shared interest or bias on the part of Benita and Alvarado

42

as well as potential motives for homicide that Alvarado might harbor

(revenge for the victim's having thrown Heather out of her

apartment, a desire to end the previous relationship with the

victim, or theft of drugs or money).   (Pet., doc. 1, 26-27.)

### 1.   The State Court's Decision

The pertinent part of the CCA's decision is as follows:

B. Relationship With Heather

Defendant also contends the trial court erred by
sustaining the prosecutor's objection to defendant's
cross-examination of Gabriel regarding whether he dated
Benita's sister, Heather, after Regina's death (as Benita
had testified). Defense counsel asked Gabriel, "Again, you
haven't dated Heather [ ] since?" Gabriel responded,
"Never." Defense counsel asked, "You don't have any reason
to believe why Benita would say that, do you?" At this
point, the court sustained the prosecutor's objection. The
court itself identified the grounds as improper
impeachment and calling for speculation.

Defendant argues that this sustained objection prevented
him from exploring a motive for Gabriel to kill Regina.
Heather had stolen drugs from Regina, causing Regina to
eject her from the apartment. If Gabriel had been
romantically involved with Heather, he might have shared
her motive for revenge against Regina.

Again, assuming that defendant's counsel should have been
allowed to ask Gabriel why Benita would lie about his
relationship with Heather, we find any error harmless. The
defense successfully generated evidence of motive in both
Gabriel and Benita. As for Gabriel's motive to kill
Regina, most of the evidence revolved around Gabriel's
long-standing love for Regina, now unreturned, and his
currently unfulfilling relationship with her. In our
opinion, evidence of Gabriel's romantic interest in
Heather, although an alternative motive, seemed to operate
in direct contradiction to the strongest and most
plausible defense theory. Thus, we believe that Gabriel's
opinion of why Benita would lie about his relationship
with Heather would have added little to the defense. And,

43

> as we have explained, the evidence against defendant was overwhelming. For these reasons, we conclude that any error in preventing Gabriel from giving his opinion on why Benita would lie about his relationship with Heather was harmless under any standard. (*People v. Watson*, supra, 46 Cal.2d at p. 836; *Chapman v. California, supra*, 386 U.S. at p. 24.)

People v. Ortega, 2011 WL 1449538, at *14-*15.

### 2.   Analysis

Although counsel's question sought to elicit arguably relevant information, the state court reasonably concluded on the basis of record evidence that any erroneous prohibition of this specific question was harmless in view of the extensive independent evidence warranting an inference that Alvarado had a motive to kill the victim, including the violent history they shared, Alvarado's disappointment with the limited nature of his relationship with the victim, and his frustration over the victim's involvement with another man.  The jury was also informed of the history between the victim and Benita and Heather.  Under the circumstances, limiting the specific probe of Alvarado's state of mind regarding Benita's motive to prevaricate did not have a substantial and injurious effect or influence in determining the jury's verdict.

### E.   Cross-Examination regarding Ochoa's Pending Criminal Charge

Petitioner argues that he suffered a denial of the right to confront and cross-examine essential prosecution witness Benita Ochoa about a new, pending charge of possession of cannabis while in

the county jail.  Petitioner contends the new charge was essential impeachment material because it showed that Ochoa intended to continue to commit felonies, and it reflected directly on her trustworthiness and truthfulness.  (Pet., doc. 1 at 5, 28-29.) Petitioner notes that her credibility was questionable, and he highlights the fact that the jury necessarily rejected Ochoa's testimony implicating alleged co-participants Hernandez and Verdugo because the jury acquitted them.  (Trav., doc. 27, 16.)

          1.   The State Court's Decision

    The decision of the CCA on this issue is as follows:

Defendant next asserts that the trial court erred when it sustained the prosecutor's objections to defense counsel's cross-examination of Benita regarding her pending charge of possessing marijuana in jail.

Assuming it was error to preclude this impeachment of Benita's credibility, any error was harmless. As we have explained, Benita's credibility had already been thoroughly tarnished, and she had already been shown to be a drug abuser. We are confident that her pending charge for marijuana possession in jail would have come as no surprise to anyone in the jury, and we believe it could not have further damaged her credibility in any meaningful way. Furthermore, evidence provided by sources other than Benita supported the conclusion that defendant was guilty. For example, police discovered that defendant left someone a message about getting a gun; Gabriel witnessed a man wearing a red hat and a red bandana over his face shoot Regina and take her property; police determined that the expended cartridges at the crime scene had been fired by defendant's rifle; a witness saw defendant and a neighbor pushing Regina's red Geo into a back yard; the witness saw defendant and two other men set Regina's red Geo on fire; police observed defendant disposing of the murder weapon; the detective observed that defendant's cell phone wallpaper was a photograph of a male dressed in a red hat with a red bandana over his face; and police found more

expended cartridges fired by defendant's [rifle] and
Regina's personal property in the SUV. Again, any error
was harmless under any standard. (*People v. Watson, supra*,
46 Cal.2d at p. 836; *Chapman v. California, supra*, 386
U.S. at p. 24.)

People v. Ortega, 2011 WL 1449538, at *15.

### 2. Analysis

The record contained evidence of Benita Ochoa's inconsistent

statements, her plea bargain and cooperation with authorities, her

drug use, and her callous and disloyal conduct toward the victim on

the night of the murder.  Even assuming the discretionary exclusion

of evidence could violate the Due Process Clause, a fairminded

jurist could agree with the CCA that foreclosure of additional

examination regarding Ochoa's unrelated minor drug charge did not

significantly impair the otherwise extensive and potentially

effective impeachment of Ochoa, and it could not have prejudiced

Petitioner, whose guilt was strongly established by multiple,

independent sources of evidence.  It could reasonably be concluded

that the state court acted in the interest of imposing reasonable

limits on cross-examination.

The state court's decision that Petitioner suffered no

prejudice was not contrary to, or an unreasonable application of

clearly established federal law.  Accordingly, it will be

recommended that Petitioner's various claims concerning limitations

on defense cross-examination be denied.

///

V.   Admission of Petitioner's Parole Status

Petitioner alleges he suffered a violation of his right to a fair trial and to due process protected by the Sixth and Fourteenth Amendments when the trial court denied a defense motion for a mistrial after an officer testified to Petitioner's parole status in violation of an in limine ruling excluding the evidence.   Petitioner contends that the prejudicial error was not cured by the court's admonishing the jury to disregard the evidence.   (Pet., doc. 1, at 5, 9, 30-32.)

A.   The State Court's Decision

The decision of the CCA on this issue is as follows:

> Defendant contends that the officer's testimony that defendant stated he was on parole when he was apprehended—testimony in violation of a pretrial ruling—was prejudicial error. He claims the trial court erred in denying his motion for a mistrial, and the court's admonition to the jury to ignore the testimony about his parole status could not undo the damage and simply caused further prejudice.
>
> We again conclude that any error in the trial court's denial of the mistrial motion was harmless. Even if the jurors could not wipe the brief testimony from their minds, their knowledge of defendant's parole status could not have prejudiced defendant. His reputation as a law-abiding citizen was nonexistent, and the evidence pointed overwhelmingly to his guilt. The evidence established him as a gun-toting car thief who shot a woman in cold blood as retribution for a bad drug deal, stole her car and her CD's, then set her car on fire. Even defense counsel repeatedly portrayed defendant as an unintelligent car thief. Defendant's prior criminality and parole status could not have surprised the jurors. We cannot conceive that this revelation made defendant look any worse than he did already. Under these circumstances, we have no doubt that the incidental remark about his parole status was

harmless. (*People v. Watson*, supra, 46 Cal.2d at p. 836;
*Chapman v. California, supra*, 386 U.S. at p. 24; see,
e.g., *People v. Allen* (1978) 77 Cal.App.3d 924, 935
[improper reference to a prior conviction is
nonprejudicial in the light of a record that points
convincingly to guilt]; *People v. Harris* (1994) 22
Cal.App.4th 1575, 1580–1581 [any error harmless in light
of overwhelming evidence].)

People v. Ortega, 2011 WL 1449538, at *16.

        B.   Analysis

    No Supreme Court precedent has established that the admission

of evidence can constitute a due process violation sufficient to

establish habeas relief.  Holley v. Yarborough, 568 F.3d at 1101.

Thus, the state court decision here could not be contrary to, or an

unreasonable application of, clearly established federal law within

the meaning of § 2254(d)(1).

    Even assuming that pursuant to Supreme Court precedent, the

admission of evidence could constitute a violation of the Due

Process Clause, the CCA reasonably concluded the evidence was

harmless.  In light of the overwhelming evidence of Petitioner's

guilt and the defense's portrayal of Petitioner as a criminal

offender, testimony that he was on parole at the time of his arrest

could not have had a substantial and injurious effect or influence

in determining the jury's verdict.

    Petitioner has failed to establish that he is entitled to

habeas relief.  Accordingly, it will be recommended that

Petitioner's due process claim concerning the admission of his

48

parole status be denied.

VI.   Admission of Cell Phone Wallpaper

Petitioner argues that admission of "wallpaper" taken from Petitioner's cellular telephone that showed someone wearing a bandana over the bottom half of his face violated Petitioner's rights under the Sixth and Fourteenth Amendments because it was not identified as a photograph of him and was prejudicial.   Petitioner argues that the fact that he carried the telephone at the time of his arrest along with the testimony of an officer that the photograph looked like Petitioner was an insufficient foundation. Thus, when the prosecutor referred to the image as representing Petitioner in argument, he was in effect vouching or testifying as an unsworn witness.   The prosecutor also argued that the bandana in the wallpaper was the same bandana observed by Alvarado on one of the perpetrators.   (Pet., doc. 1 at 6, 33-35; trav., doc. 27, 29-30.)

A.   The State Court's Decision

The CCA rejected Petitioner's argument that the evidence lacked a sufficient foundation and was irrelevant.   It upheld admission of the evidence as a proper exercise of discretion.   The state court reasoned that a photograph may be shown to be a correct reproduction of what it purports to show through the testimony of anyone who knows the picture correctly depicts what it purports to represent, assisted by other matters, including those which are inherent

49

aspects of the picture itself, provided the other matters are reliable and together with the testimony sufficiently disclose the authenticity and genuineness of the photograph. People v. Ortega, 2011 WL 1449538, at *16-*17.

The issue of the identity of the person depicted in the wallpaper was left to the jury. The state court reasoned that even if the person depicted was not Petitioner, and even if the time and place and other circumstances of the taking of the photograph were not established, the wallpaper image was nevertheless relevant to show Petitioner chose to display prominently on the opening screen of his cell phone an image of a person (possibly himself) dressed in a manner similar to that of the perpetrator of the crimes. These facts warranted an inference that Petitioner personally related to the image, admired it, and derived satisfaction from both viewing and exhibiting it. This evidence, combined with Petitioner's having worn a red bandana and having photographed himself at the party, and his having carried a red bandana when arrested, supported the inference that he adopted the same style and sometimes wore a red hat and a red bandana over his face, such as during the robbery and killing of the victim. The state court further concluded, with citation of both Watson (state court error standard) and Chapman (standard of harmless error review for a constitutional violation) that "even if the admission of the photograph was error, it was harmless in light of the overwhelming evidence against defendant."

People v. Ortega, 2011 WL 1449538, at *17.

   B.   Analysis

To the extent Petitioner complains of the state court's application and interpretation of state law, this Court is bound by the state court's determinations.  The claim does not warrant relief in this proceeding, and it is subject to dismissal.

To the extent no Supreme Court precedent has established that the admission of evidence can constitute a due process violation sufficient to warrant habeas relief, the CCA's decision could not have been contrary to, or an unreasonable application of, clearly established federal law within the meaning of § 2254(d)(1).  See, Holley v. Yarborough, 568 F.3d at 1101.

The state court reasonably decided that if there had been any error, it was harmless because of the evidence of Petitioner's guilt.  The admission of the cell phone wallpaper could not have had a substantial and injurious effect or influence in determining the jury's verdict.  Accordingly, it will be recommended that Petitioner's due process claim concerning the admission of the cell phone wallpaper be denied.

   VII.   Cumulative Error

Petitioner alleges the trial court's cumulative errors violated his right to due process of law guaranteed by the Sixth and Fourteenth Amendments.  Petitioner contends the jury was biased against Petitioner because of the unfair limitations on impeachment

51

of the critical prosecution witnesses, the improper admission of
Petitioner's prior juvenile adjudication, and the prosecutor's
argument regarding the cell phone wallpaper.  Petitioner argues the
length of jury deliberations (two full days and two partial days),
the jury's requests for rereading of the testimony of Alvarado and
Ochoa, and the partial verdicts (the acquittal of Verdugo and
acquittal of Hernandez of the murder charge) demonstrate that it was
a close case, and thus the numerous errors of the trial court were
prejudicial.  (Pet., doc. 1 at 6, 36-39.)

A.   The State Court's Decision

The decision of the CCA is as follows:

> Next, defendant contends the cumulative impact of these
> purported errors denied him a fair trial and due process.
> He argues that the case was a close one, evidenced by the
> jurors' lengthy deliberations (more than two days),
> testimony readbacks, and lighter verdicts against
> Hernandez and Verdugo.

> As to each contention, however, we have found either no
> error or no prejudice. Whether defendant's contentions are
> considered individually or cumulatively, he was not
> deprived of due process or his right to a fair trial.

> Furthermore, this was not a close case against defendant;
> the evidence was overwhelming, even if the witnesses were
> not ideal. As we have "'either rejected on the merits
> defendant's claims of error or have found any assumed
> errors to be nonprejudicial[,]'" we reach the same
> conclusion with respect to the cumulative effect of any
> purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158,
> 1235-1236; *People v. Rogers* (2009) 46 Cal.4th 1136, 1181.)

People v. Ortega, 2011 WL 1449538, at *17.

///

B.  <u>Analysis</u>

The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair, even though no single error rises to the level of a constitutional violation or would independently warrant reversal.  <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298, 302-03 (1973)).  Traditional principles of due process provide that cumulative errors warrant habeas relief only where the errors have so infected the trial with unfairness that the resulting conviction denies due process, such as where the combined effect of the errors had a substantial and injurious effect or influence on the jury's verdict, <u>id.</u> (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) and <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)), and where the combined effect of individually harmless errors renders a criminal defense far less persuasive than it might otherwise have been, <u>id.</u> (citing <u>Chambers</u>, 410 U.S. at 294, 302-03).

In evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused by the errors.  If the evidence of guilt is otherwise overwhelming, the errors are considered "harmless," and the conviction will generally be affirmed.  <u>Parle v. Runnels</u>, 505 F.3d at 927-28.  The overall strength of the prosecution's case must be considered because where the government's case on a critical element is weak, or where the verdict or conclusion is only weakly supported by the record, it is more likely that trial errors will be prejudicial to the defendant.  <u>Id.</u> at 928.

53

Here, in view of the previous analysis of the nature and effect of the errors, and considering them in light of the government's extremely strong case, a fairminded jurist could agree with the CCA that Petitioner's due process rights were not violated because of the absence of prejudicial unfairness.  Accordingly, it will be recommended that Petitioner's cumulative error claim be denied.

In summary, it will be recommended that the petition for writ of habeas corpus be denied.

VIII.   <u>Certificate of Appealability</u>

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).  A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Habeas Rule 11(a).

A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336 (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether: (1)

the petition states a valid claim of the denial of a constitutional

right, and (2) the district court was correct in any procedural

ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the

claims in the habeas petition, generally assesses their merits, and

determines whether the resolution was debatable among jurists of

reason or wrong.  Id.  An applicant must show more than an absence

of frivolity or the existence of mere good faith; however, the

applicant need not show that the appeal will succeed.  Miller-El v.

Cockrell, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate

whether the petition should have been resolved in a different

manner.  Petitioner has not made a substantial showing of the denial

of a constitutional right.  Accordingly, it will be recommended that

the Court decline to issue a certificate of appealability.

IX.  Recommendations

In accordance with the foregoing analysis, it is RECOMMENDED

that:

1)  The petition for writ of habeas corpus be DENIED; and

2)  Judgment be ENTERED for Respondent; and

3)  The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United

States District Court Judge assigned to the case, pursuant to the

provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

Rules of Practice for the United States District Court, Eastern

District of California.  Within thirty (30) days after being served

with a copy, any party may file written objections with the Court

and serve a copy on all parties.  Such a document should be

captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **March 27, 2015**                        **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE